IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA23-612

Filed 6 February 2024

Watauga County, Nos. 22 JA 46-47

IN THE MATTER OF: K.C., M.A.

Appeal by Respondents from orders entered 21 December 2022, 30 January 2023, and 4 April 2023 by Judge Matthew Rupp in Watauga County District Court. Heard in the Court of Appeals 9 January 2024.

> *Fox Rothschild LLP, by Brian C. Bernhardt, for Guardian ad Litem; and Di Santi Capua & Garrett PLLC, by Chelsea B. Garrett, for Watauga County Department of Social Services, Petitioner-appellee.*
>
> *Jeffrey L. Miller, for Respondent-Father-appellant.*
>
> *Assistant Parent Defender Jacky L. Brammer and Parent Defender Wendy C. Sotolongo, for Respondent-Mother-appellant.*

WOOD, Judge.

## I. **Factual and Procedural History**

Father and Mother (together, "Respondents") were unmarried partners living together as a family unit along with their children, Kylie and Martin.[1]  Father is the

---

[1] Pseudonyms are used to protect the identity of the juveniles pursuant to N.C. R. App. P. 42(b).

biological father of Martin and stepparent of Kylie. On 24 August 2022, Watauga County Department of Social Services ("DSS") filed juvenile petitions alleging that Kylie and Martin[2] were neglected juveniles within the meaning of N.C. Gen. Stat. § 7B-101(15)(e). The petitions were based on a report from a third party of possible domestic violence, improper discipline, and substance use in the home. Kylie was seven years old, and Martin was two years old at the time juvenile petitions were filed. Upon the filing of the petitions, the trial court entered orders for nonsecure custody as to both children, and DSS removed the children from their home and placed them in foster care.

On 31 August 2022, Selena Moretz ("Moretz"), the director of the Children's Advocacy Center of the Blue Ridge, conducted a forensic interview with Kylie, which was videotaped. During the interview, Kylie and Moretz had the following exchanges:

> [KYLIE]: [S]ometimes [Father] hits my mom. . . . And then she has a black eye. . . . [T]he reason I know—I know how my mommy gets hit by him is because I wake up and I hear her screaming. . . . I heard a, no, like a loud no. And then it just went quiet. . . . And then I heard my mommy come into the bathroom. But then I started to close my eyes so she thought I was sleeping, she went into the bathroom and shut the doors hard. . . . And the morning I saw a black eye on her. . . . So she just said I fell and landed on something. . . . [B]ut then we knowed it wasn't that. . . . [I]t's been more than once.
>
> . . .

---

[2] The original juvenile petition named Martin as an "Unknown male child," but amended juvenile petitions were filed on 29 August 2022 and 28 September 2022 adding Martin's name and identifying Father as his biological father.

I have seen it with my eyes. . . . [S]o when I was younger when I was at Valle Crucis School . . . she woke me up and she had a bruise under her eye and the top of her eye.

. . .

MORETZ: Uh-huh. But whenever you say that you see him hit your mom; tell me about where you're at when you see that.

[KYLIE]: So I am usually on the couch. . . . But, like, I can hear her. . . . I can hear her scream no. . . . But when I said I seen him hit her is . . . I was watching TV and then my mommy looked on his phone and he had—he had another girlfriend that my mommy knowed about it and he dumped her. But then he was texting her and said, I love you, good night. . . . So then she flipped out and then [Father] got mad. And then—and then he hit her. And then they went into the—she wanted me to go into the bathroom some place where he wouldn't hurt us. So we—so she took me and [Martin] in the bathroom and there was blood.

. . .

MORETZ: Tell me about where the blood was at.

[KYLIE]: It was on the curtains and on the ground, it was on the bathtub a little bit. It was on the sink, like she was crying. . . . We stayed there for a couple of more minutes until it was quiet. Then we went out. . . . [Mother] told us to just go to bed. And then nothing—and it's going to be okay.

. . .

MORETZ: Has there ever been a time that you've been scared or worried about what [Father] is doing or saying?

[KYLIE]: Yeah. I am scared that one day [Father] is going to hit me.

Kylie further told Moretz that Father is "very mean to [Martin.] If he cries when he's going to sleep, he will spank him. . . . [H]e won't say what do you want. He would just spank him sometimes." Finally, Kylie stated there was a time when Mother made breakfast and left for work, planning to bring dinner home that night, and Father did not allow Kylie or Martin to eat the whole day, except for one snack.

The adjudication hearing was held 25 October 2022. DSS presented two witnesses: Ashley Hartley ("Hartley"), the social worker who filed the juvenile petitions and initially brought law enforcement with her to Respondents' home, and Moretz. As its final evidence, DSS entered the videotape of the forensic interview into evidence and played it for the court. The entire interview is approximately one hour. Father testified in opposition to DSS's case; Mother did not testify. Father testified he "heard Kylie's remarks in the video." Father was asked about Kylie's remarks that Mother "was hit and was screaming," and he testified that he did not know what Kylie was talking about. Father was asked if he ever observed Mother with a black eye, and he testified that there was one time Mother had a black eye after she fell down the stairs and another time when she had a pimple near her eye that became swollen, turned black, and had to be lanced. Father testified that he was not responsible for giving Mother a black eye. Father was also asked about Kylie's allegation of domestic violence at the time she attended Valle Crucis School, to which he testified, "that was at the beginning of our relationship where we was barely living together," and that it must have occurred before he entered into the current living

arrangement he had with Mother. Regarding Kylie's allegations of seeing blood after an incident between Father and Mother and hearing Mother cry, Father testified he could not remember any incidents involving blood although he has seen Mother cry on numerous occasions. In response to Kylie's allegation of the day Father did not let her or Martin eat during the day except for one snack, Father testified that the children had been snacking too much and not eating their regular food. That morning, Mother made a big breakfast before she left for work and was going to return at approximately 5:00 p.m. to make dinner. Father testified that he was firm that day that the children would only be allowed one snack between breakfast and dinner.

At the close of all evidence, counsel made closing arguments. Counsel for Mother argued:

> We've had nothing but this video of the seven-year-old and her interpretation of what she may or may not have seen. . . . [W]ithout any other evidence and no substantiation of any DV other than what was perceived by a seven-year-old, again, we would just have to leave that in the Court's discretion."

Counsel for Father argued, "I believe[ ] that all we really have in this situation is an interview where a child has made accusations about things, but we're no further along in proving that than when we started here today. None of this has been substantiated." Counsel for DSS argued:

> We've heard that there has been yelling. There was blood in the kitchen. . . . And so neither parent has offered an

explanation for that incident. And with all due respect, it comes down simply to credibility. . . . [W]e have a stepfather that said that [Mother] fell down the stairs and got a black eye, which is one of the most clichéd things ever heard about a reason for someone to get a black eye; and then another black eye was because of a stye.

Following all of the evidence and arguments of counsel, the trial court found DSS had failed to produce clear, cogent, and convincing evidence that the children were neglected. The trial court stated:

The case of the Department is based solely upon the video. The court finds that [Kylie] . . . is a delightful young lady, very articulate; and I believe—probably believed what she was saying, but I also believe that the Department could have, at a minimum, obtained the medical records relative to the mom's black eye. I never saw that.

I believe that the Department at a minimum could have got a criminal history for [Father]. While I have no reason to question his character, but he may—that may be his criminal record and it may not. There may have been other things that would have shown more light on this circumstance.

Maybe if the burden of proof was by the greater weight you might have it. I cannot find and nor can I adjudicate in this matter without clear, cogent, and convincing evidence. And I don't believe that I've been furnished that and this petition is dismissed.

The trial court ordered the children to be reunited with Father and Mother. On 23 November 2022, the trial court filed its written order dismissing the juvenile petitions.

On 1 December 2022, DSS filed a motion pursuant to N.C. R. Civ. P. 59–60 (the "Rule 59/60 motion"). In the motion, DSS stated, in relevant part:

> 1. Pursuant to Rule 59, N.C.R.P., a new trial may be granted or this Court may amend its judgment based upon: insufficiency of the evidence to justify the verdict or that the verdict is contrary to law, or any other reason recognized as grounds therefor.
>
> 2. Alternatively, pursuant to Rule 60(b)(6), N.C.R.P., DSS requests relief of this Court's judgment dismissing its Petition if the Court agrees, after a review of the record and, specifically the forensic interview recording, that it has a justifiable reason to provide DSS the relief sought.

DSS requested that the trial court "reconsider its ruling in light of certain inconsistencies in between the evidence and the [trial court's] ruling." DSS further stated that it believed in good faith "that certain key evidence, that being a video of a forensic interview with one of the Juveniles, was difficult to hear when played in Court and could have contributed to why the Court ruled as it did." DSS included ten quotations of portions of the interview, along with the video time stamps showing the exact time the statements were made. DSS printed some of the quotations in bold typeface. Finally, DSS requested the trial court to "re-listen to the forensic interview in chambers, perhaps with headphones (or where it can be more clearly heard) or, *read a transcribed copy thereof, which is in the process of being completed.*" (Emphasis added.)

The trial court held a hearing on DSS's Rule 59/60 motion on 16 December 2022. At the hearing, DSS stated that there were "anomalies" for DSS's counsel and

for Hartley in that they "found that video somewhat difficult to hear." The trial court agreed, stating, "It was difficult to hear, plus the child was so energetic running around and talking at the same time. It did present an issue for me." DSS argued that the trial court was required to make determinations regarding the credibility of the witnesses due to the conflicting "testimony" between Kylie, as presented through the videotape, and Father. The trial court stated, "I will go ahead and tell everybody here right now, my ruling was based on the fact that I didn't know what that kid was saying." The trial court reiterated that "the child . . . . was constantly moving about, picking this up, running around, talking this quick. . . . I did not hear very much and I couldn't understand very much." Counsel for Father argued that everyone in the courtroom during the adjudication hearing seemed to be able to hear the videotape and that the trial court would have made it audible if anyone had claimed it was not audible. Ultimately, the trial court took the matter under advisement and told DSS, "I do want that transcript." Counsel for Respondents objected to the trial court's consideration of the transcript of the forensic interview.

On 17 December 2022, the trial court emailed counsel its ruling granting DSS's Rule 59/60 motion. The trial court reversed its earlier ruling and adjudicated the children neglected. The trial court stated that the videotape of the forensic interview played at the adjudication hearing had poor sound quality and was difficult to understand. The trial court reported that DSS provided a transcript of the videotape, noting the transcript presented the same evidence as did the video. The trial court

stated the transcript was "clear and understandable, and had it been presented at trial, the [trial court] would have adjudicated the juveniles as neglected juveniles." The trial court directed counsel for DSS to prepare adjudication and disposition orders.

On 21 December 2022, the trial court entered its written order granting the Rule 59/60 motion. In it, the trial court stated:

> 2. [The video of the forensic interview] was a pivotal part of DSS's evidence based on the statements of the Juvenile therein. The sound quality of the video was poor which made it difficult to hear all the statements clearly, and depending on one's hearing and position in the courtroom, some of those present were able to hear the video better than others.
>
> 3. After reading the verbatim transcript of the videoed interview, this Court realized that it did not, in fact, hear certain statements that [Kylie] made in the forensic interview. The Court was able to hear- though with some difficulty- other portions of the forensic interview as it was played on the record during the hearing on DSS's Petition.
>
> 4. Therefore, the undersigned was not aware at the time of the Adjudication hearing that he had not heard the several key statements of [Kylie] which were pivotal and constitute clear, cogent, and convincing evidence in support of DSS's Petition.
>
> 5. As a result, this Court dismissed DSS's Petition for failure to meet the requisite burden of proof- clear, cogent, and convincing evidence.
>
> 6. In hindsight, and with the benefit of the verbatim transcript of the forensic interview, the Court sees that it did have clear[,] cogent[,] and convincing evidence in support of DSS's Petition. Therefore, had it clearly heard

the entirety of the forensic interview that was played in Court from beginning to end, the Court would have not dismissed DSS's Petition.

7. After the Adjudication hearing, Counsel for Petitioner, DSS, listened to the forensic interview video again to confirm the statements made by [Kylie] and filed Motions pursuant to Rules 59 and 60 of the North Carolina Rules of Civil Procedure. In support of these Motions, Counsel for Petitioner offered the verbatim sealed transcript of the forensic interview. Counsel for Respondent parents objected to the Court's consideration of the transcript.

8. The transcript presented the identical evidence as the video played in Court, but in a clear and understandable manner. Had the Court heard all of the statements of [Kylie] in the interview, it would not have dismissed DSS's Petition.

9. Extraordinary circumstances exist such that equity and justice demands this Court grant DSS the relief sought from the Court's prior Order Dismissing Juvenile Petition.

Also on 21 December 2022, the trial court held a hearing on "interim disposition." The trial court entered its written order on interim disposition on 22 February 2023 in which it ordered kinship placement of the children with their maternal grandmother. Mother was permitted to reside with them, and Father was permitted two hours supervised visitation per week with Martin and no visitation with Kylie. The permanency plan of care was reunification.

On 30 January 2023, the trial court entered its order on adjudication, finding that Father physically abused Mother in the home in the presence of the children and that Kylie witnessed such abuse, including a black eye, at least once. The trial court

adjudicated both Kylie and Martin neglected within the meaning of N.C. Gen. Stat. § 7B-101(15). The trial court granted legal and physical custody of the children to DSS.

On 9 February 2023, Mother filed a notice of reservation of right to appeal the 30 January 2023 order. On 28 February 2023, the trial court held a hearing on final disposition, and on 4 April 2023, it filed its written disposition order which continued the children in the custody of DSS and in kinship placement with their maternal grandmother and retained the permanency plan of reunification.

On 6 April 2023, Father and Mother filed a notice of appeal of the adjudication order entered 30 January 2023 and the disposition order entered 4 April 2023.

## II. <u>Analysis</u>

### A. Petitions for *Writ of Certiorari*

First, we must determine whether this Court has jurisdiction to review Respondents' appeals on their merits. Both Father and Mother filed petitions for *writ of certiorari* because they seek appellate review of judgments they contend are void. Our Supreme Court has said of void judgments:

> A judgment is void, when there is a want of jurisdiction by the court over the subject matter of the action, and a void judgment may be disregarded and treated as a nullity everywhere. . . . A void judgment is, in legal effect, no judgment. No rights are acquired or divested by it. It neither binds nor bars any one, and all proceedings founded upon it are worthless."

*Hart v. Thomasville Motors, Inc.*, 244 N.C. 84, 90, 92 S.E.2d 673, 678 (1956) (citations and quotation marks omitted).

N.C. Gen. Stat. § 7A-32 authorizes this Court to issue a *writ of certiorari* "in aid of its own jurisdiction, or to supervise and control the proceedings of any of the trial courts of the General Court of Justice." N.C. Gen. Stat. § 7A-32(c). "The practice and procedure shall be as provided by statute or rule of the Supreme Court, or, in the absence of statute or rule, according to the practice and procedure of the common law." *Id.* Rule 21 of the Rules of Appellate Procedure provides in pertinent part:

> The writ of certiorari may be issued in appropriate circumstances by either appellate court to permit review of the judgments and orders of trial tribunals when the right to prosecute an appeal has been lost by failure to take timely action, or when no right of appeal from an interlocutory order exists, or for review pursuant to N.C.G.S. § 15A-1422(c)(3) of an order of the trial court ruling on a motion for appropriate relief.

N.C. R. App. P. 21(a)(1). Our Supreme Court has explained:

> The procedure governing writs of certiorari is found in Rule 21 of the Rules of Appellate Procedure. But Rule 21 does not prevent the Court of Appeals from issuing writs of certiorari or have any bearing upon the decision as to whether a writ of certiorari should be issued. Instead, the decision to issue a writ is governed solely by statute and by common law.

*Cryan v. Nat'l Council of Young Men's Christian Associations of United States*, 384 N.C. 569, 572, 887 S.E.2d 848, 851 (2023) (citation and quotation marks omitted). Our appellate courts employ a two-factor test to determine whether a *writ of certiorari* should issue: (1) "if the petitioner can show merit or that error was probably

committed below" and (2) "if there are extraordinary circumstances to justify it," including "a showing of substantial harm." *Id.* at 572, 887 S.E.2d at 851 (quotation marks omitted).

Because, as discussed below, we hold the trial court did not possess subject matter jurisdiction to enter its 21 December 2022 order after its order dismissing the petition on 23 November 2022, any order entered after the dismissal was void. Therefore, any notice of appeal by Father and Mother of any order entered after the dismissal of the petition was ineffective because it was an appeal from a void order, and "all proceedings founded upon [a void judgment] are worthless." *Hart*, 244 N.C. at 90, 92 S.E.2d at 678. Although Mother filed a notice of reservation of right to appeal the trial court's 30 January 2023 order, and both Father and Mother filed notices of appeal of that same order as well as the dispositional order entered 4 April 2023, N.C. R. App. P. 21(a)(1) does not apply to these particular circumstances. This is because Father and Mother seek appeal of a void order. Accordingly, we must determine whether this Court should, "in aid of [our] own jurisdiction," grant Respondents' petitions for *writ of certiorari* pursuant to N.C. Gen. Stat. § 7A-32(c).

Because the trial court did not have jurisdiction to enter orders in this matter after dismissing the juvenile petition, Respondents' contention that the trial court erred has merit. They also make a showing of extraordinary circumstances because of the substantial harm resulting from the separation of a family due to a void order

and the lack of finality in a juvenile case. Accordingly, we grant their petitions for *writ of certiorari.*

**B. The Trial Court's Subject Matter Jurisdiction After Dismissal**

Respondents argue: (1) the trial court did not have subject matter jurisdiction to grant DSS's Rule 59/60 motion; (2) even if the trial court did have subject matter jurisdiction, it abused its discretion in granting the motion; and (3) the trial court erred in adjudicating the children neglected. Because we hold that the trial court did not have subject matter jurisdiction to grant the Rule 59/60 motion, we need not reach the other issues raised.

"Whether or not a trial court possesses subject-matter jurisdiction is a question of law that is reviewed de novo. Challenges to a trial court's subject-matter jurisdiction may be raised at any stage of proceedings, including for the first time" on appeal. *In re M.R.J.*, 378 N.C. 648, 654, 862 S.E.2d 639, 643 (2021).

Respondents argue that N.C. Gen. Stat. §§ 7B-201 and 7B-807 provide that a trial court's jurisdiction in a juvenile abuse, neglect, or dependency action is terminated upon the dismissal of a juvenile petition. We agree. Initially, a trial court obtains jurisdiction over a juvenile abuse, neglect, or dependency proceeding when a petition alleging the same is filed: "The court has exclusive, original jurisdiction over any case involving a juvenile who is alleged to be abused, neglected, or dependent." N.C. Gen. Stat. § 7B-200(a). A trial court's jurisdiction ends, however, when it dismisses the juvenile petition upon a finding that the allegations contained in the

petition are unproven. N.C. Gen. Stat. § 7B-201(a) provides, "When the court obtains jurisdiction over a juvenile, *jurisdiction shall continue until terminated by order of the court* or until the juvenile reaches the age of 18 years or is otherwise emancipated, whichever occurs first." N.C. Gen. Stat. § 7B-201(a) (emphasis added). N.C. Gen. Stat. § 7B-201(b) further provides that, except in five enumerated circumstances, which are not applicable to this case:

> When the court's jurisdiction terminates, whether automatically or by court order, *the court thereafter shall not modify or enforce any order previously entered in the case*, including any juvenile court order relating to the custody, placement, or guardianship of the juvenile. *The legal status of the juvenile and the custodial rights of the parties shall revert to the status they were before the juvenile petition was filed*, unless applicable law or a valid court order in another civil action provides otherwise.

N.C. Gen. Stat. § 7B-201(b) (emphasis added). N.C. Gen. Stat. § 7B-807(a) provides, "If the court finds that the allegations have not been proven, the court *shall dismiss the petition with prejudice*, and if the juvenile is in nonsecure custody, the juvenile *shall be released to the parent*, guardian, custodian, or caretaker." N.C. Gen. Stat. § 7B-807(a) (emphasis added). In summary, these statutes provide that the trial court's jurisdiction begins upon the filing of a petition and ends when the trial court dismisses the petition upon a finding that the allegations have not been proven.

Here, in the original adjudication hearing, the trial court explicitly stated in open court that DSS's case was "based solely upon the video" and that DDS did not prove its case by clear, cogent, and convincing evidence, specifically finding that DSS

could have provided other evidence such as medical records pertaining to Mother's black eye as well as Father's criminal history. Upon dismissing the petition, the trial court then ordered the children reunited with Father and Mother, as *required* by N.C. Gen. Stat. § 7B-807(a). Finally, the trial court entered its written order summarily dismissing the juvenile petitions (also as required by N.C. Gen. Stat. § 7B-807(a)), which was an order by the trial court causing the termination of its jurisdiction because there was no longer a juvenile petition before it. N.C. Gen. Stat. § 7B-201(a) ("When the court obtains jurisdiction over a juvenile, jurisdiction shall continue until terminated by order of the court"). Upon the trial court's dismissal of the juvenile petition, and the simultaneous termination of its jurisdiction, "[t]he legal status of the juvenile and the custodial rights of the parties . . . revert[ed] to the status they were before the juvenile petition was filed." N.C. Gen. Stat. § 7B-201(b). Therefore, the trial court's jurisdiction terminated, at the latest, on 23 November 2022 when it entered the written order dismissing the petitions.

As a practical matter, it is not immediately apparent on appeal what the auditory issue was during the adjudication hearing. The full recording of the interview was played before the trial court. Aside from the recording, Father testified that he "heard [Kylie's] remarks in the video." He was questioned on direct and cross-examination regarding the particular allegations contained in the recording of the interview: that Mother "was hit and was screaming"; whether he ever saw Mother with a black eye; the allegation of domestic violence while Kylie attended Valle Crucis

School; the appearance of blood in the home; and the issue of whether Father deprived the children of proper nutrition while Mother was at work. Even if these particular allegations could not all be heard properly while the recording was played, there was a second chance to hear and consider them during Father's testimony. There was yet another opportunity to hear and consider such allegations during the attorneys' closing arguments. Counsel for Mother argued there was "no substantiation of any DV other than what was perceived by a seven-year-old." Counsel for DSS specifically reiterated the allegations concerning yelling, blood, a black eye, and that Kylie herself witnessed such things. These were further opportunities for the trial court to hear and consider the allegations, weigh credibility, and make findings of fact, if necessary. In its oral ruling on the matter, the trial court weighed Kylie's credibility, demonstrating its understanding that Kylie made allegations of witnessing Father commit domestic violence. The trial court even mentioned "mom's black eye."

The Rule 59/60 motion cannot operate as a method to claw back jurisdiction and reconsider the evidence, as DSS asked the trial court to do in this case. The trial court may have had second thoughts "[i]n hindsight," but the Rule 59/60 motion was the improper method to seek reconsideration, and granting the motion was an improper method to implement remorse for the trial court's initial ruling.[3] Once the

---

[3] We note that DSS could have appealed the trial court's initial adjudication decision. N.C. Gen. Stat. § 7B-1001 specifically allows an appeal from an "involuntary dismissal of a petition." N.C. Gen. Stat. § 7B-1001(a)(2). We note that "[n]either a Rule 59 motion nor a Rule 60 motion may be used as a substitute for an appeal." *Musick v. Musick*, 203 N.C. App. 368, 371, 691 S.E.2d 61, 63 (2010).

trial court summarily dismissed the petition due to DSS's failure to prove its case, the trial court's subject matter jurisdiction terminated. DSS cannot bypass an appeal with a Rule 59/60 motion, and the trial court cannot swap its initial adjudication decision after dismissal of the petition.

Accordingly, we overrule DSS's argument that N.C. R. Civ. P. 59(a) and 60(b) operate to allow a trial court to act on a juvenile petition even after dismissing a petition for failure to prove the allegations contained within it. Because the trial court's subject matter jurisdiction terminated when it entered its order dismissing the juvenile petition, its order granting DSS's Rule 59/60 motion, and all subsequent orders are *void ab initio*. *In re T.R.P.*, 360 N.C. 588, 590, 636 S.E.2d 787, 790 (2006) ("A judgment is void[ ] when there is a want of jurisdiction by the court over the subject matter. A void judgment is in legal effect no judgment. No rights are acquired or divested by it. It neither binds nor bars anyone, and all proceedings founded upon it are worthless.") (ellipsis omitted). Regardless of whether or not N.C. R. Civ. P. 59 and 60 may otherwise be applicable in juvenile cases in some limited circumstances, they are inapplicable here because the trial court lacked jurisdiction to enter an order on the Rule 59/60 motion. Once the trial court divests itself of jurisdiction, it cannot thereafter revive it.

### III. <u>Conclusion</u>

For the foregoing reasons, we hold the trial court's subject matter jurisdiction terminated when it dismissed the juvenile petitions following its finding that DSS did

not prove its case by clear and convincing evidence. Because its order granting DSS's Rule 59/60 motion and all subsequent orders are *void ab initio* and must be vacated, all orders entered after the order of dismissal of the petitions are hereby vacated.

VACATED.

Judges FLOOD and STADING concur.